UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
WYETH,

                              Plaintiff,
                                                      **MEMORANDUM**
          – against –                                 **and ORDER**

KING PHARMACEUTICALS, INC.,                           04 CV 4068 (SLT)(RML)

                              Defendant.
----------------------------------------------------------------X

**TOWNES, United States District Judge:**

      Plaintiff, Wyeth,[1] a Delaware corporation, moves for summary

judgment on the issues of liability and damages in this breach of contract

action.  Defendant, King Pharmaceuticals, Inc. ("King"), a Tennessee

corporation,  moves to strike the *ad damnum* clause of the complaint or, in the

alternative, for summary judgment.  For the reasons discussed below, Plaintiff's

motion and those of the Defendant are hereby DENIED.  The Court's Order,

dated December 22, 2004, holding discovery in abeyance, is hereby vacated.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

      On September 20, 2004, Wyeth commenced this action against

King, alleging one cause of action for breach of contract.  In an agreement

dated June 22, 2000 (the "Copromotion Agreement"), the parties agreed that for

a term of eight years, they would work together to promote Altace®, a

pharmaceutical product designed to reduce the risk of heart attacks and strokes.

(*See* Czenszak Dec., Ex. 1 (the "Agreement") at 1; *see also* Pl. 56.1 Stat. ¶ 1;

_____

    [1]Wyeth was formerly known as American Home Products Corporation ("AHPC").

Def. 56.1 Stat. ¶ 1; Compl. ¶ 1.)  Before entering into this agreement, King

marketed and distributed Altace®, and Wyeth "was engaged in the business of

and had expertise in" promoting pharmaceutical products to physicians.  (*See*

id.)  King granted Wyeth exclusive rights to promote Altace®, together with

King.  (Agreement § 2.1.)  Wyeth received twenty-five million dollars as an

initial payment for these rights at the time the parties executed the contract, and

another fifty million dollars thirty days thereafter.  Id.  King was also required

to pay Wyeth annual promotion fees calculated as percentages of net sales for

each of the years of the contract.  (Agreement § 9.1.)

To ensure the success of Altace®, each party's sales force is

required to make a certain number of visits, called "Details" (*see* Agreement

§§ 3.1, 4.1), to physicians' offices to promote the pharmaceutical product.[2]

Every year, the Altace® Management Committee ("AMC"), on which three

representatives of each party sit, creates an annual marketing plan that sets out

the minimum number of required Details per quarter and for the year.  (*See*

Agreement §§ 8.1, 8.5.)

At issue on these cross-motions are two sections of the

Copromotion Agreement: Section 9.4 and Section 11.4.  Section 9.4 of the

Copromotion Agreement states in its entirety:

> If, during any calendar year during the Term, a party
> reasonably determines, based on the AHPC Detail
> Reports or the KING detail reports, as the case may

---

[2] The Corpromotion Agreement states that "'Detail(s)' or 'Detailing' shall mean a face-to-face contact by a sales representative with a Physician during which time the promotional message involving the Product is a primary topic of discussion and the product discussed for either the longest period of time during the contact or, at a minimum, discussed no less than the second longest period of time during the contact."  (Agreement, Annex 1-2.)

be, that the other party is failing to conduct the minimum number or percentage of Details (the "**Minimum Targeted Details**") required to be conducted by such other party by the Marketing Plan for such year, then such party may elect to conduct a greater number of Details than the Minimum Targeted Details for such party (such greater number of Details, the "**Excess Details**").  A party conducting Excess Details shall notify the other party promptly in writing following the Agreement Quarter in which such Excess Details were conducted, and within thirty (30) days after receipt of such notice, the other party shall pay to such party an amount equal to two (2) times the then Current Detail Cost multiplied by the number of Excess Details; *provided*, that any payments to a party under this *Section 9.4* on Details in excess of one hundred five percent (105%) of the Minimum Targeted Details for such party for any calendar year shall be subject to prior approval of the AMC.

(Agreement § 9.4) (emphasis in original).  Section 11.4 of the Copromotion

Agreement states in its entirety:

Notwithstanding any provision in this Agreement to the contrary, in the event that either party (the "Nonperforming Party") fails to perform at least ninety percent (90%) of the minimum number of Details it is required to perform during any calendar year and the other party has performed at least ninety percent (90%) of the minimum number of Details it is required to perform during such calendar year, such other party shall have sixty (60) days from its receipt of the Nonperforming Party's final Detail Report for such calendar year to notify the Nonperforming Party that it is in breach of such obligations, in which event the Nonperforming Party shall have the opportunity to cure such default by providing a sufficient number of extra Details to make up for such short fall prior to the end of the first full calendar quarter following the calendar quarter in which the other party provides such breach notice to the Nonperforming Party.  In the event the Nonperforming Party fails to cure such default, the other party may, within thirty (30) days after the end of such calender quarter terminate this Agreement on

sixty (60) days' prior notice to the Nonperforming
Party. If the other party (i) fails to give timely notice
of the Nonperforming Party's breach or of
termination due to the other Nonperforming Party's
failure to cure such breach in accordance with this
*Section 11.2(b)* [*sic*] or (ii) elects, in accordance with
*Section 9.4* hereof, to perform excess Details to make
up the Nonperforming Party's shortfall of required
Details, the other party shall be deemed to have
waived its rights under this *Section 11.2(b)* [*sic*] as to
any further breaches by the Nonperforming Party.
Notwithstanding the foregoing, the parties agree that
the Nonperforming party shall not be in breach of its
Detailing obligations for any calendar year hereunder
if the Nonperforming party provides at least ninety
percent (90%) of the minimum number of Details it
is required to perform during such calendar year.

(Agreement § 11.4) (emphasis in original).

Wyeth states (and King does not dispute) that King failed to meet

the minimum number of required Details for the second and third quarters of

2003. (Pl. 56.1 Stat. ¶¶ 2-3; Def. 56.1. Stat. ¶¶ 2-3.) Specifically, the

minimum number of Details required in the second quarter of 2003 was

288,333; King reported 248,082 Details for this quarter. (Pl. 56.1 Stat. ¶¶ 2;

Def. 56.1. Stat. ¶¶ 2-3.) For the third quarter, it reported 241,348 Details

against a minimum of 288, 334. (Pl. 56.1 Stat. ¶¶ 3; Def. 56.1. Stat. ¶¶ 2-3.)

King claims that it "assured Wyeth that it was taking (and indeed did take)

appropriate action to bolster its sales force to meet its 2003 Detailing

Obligations." (Def. 56. Stat. ¶¶ 2-3.) Nevertheless, it is undisputed that King

did, in fact, conduct the minimum number of required Details for the year, *e.g.*,

90% of the 2003 minimum number of required Details. *Id.*

After receiving notification that King failed to meet its minimum

number of required Details for the third quarter of 2003–the second such

quarter in a row, Wyeth claims that it "made a reasonable determination" that King "was failing to conduct the minimum number of Details required [pursuant to] the 2003 Altace® Marketing Plan." (Pl. 56.1 Stat. ¶ 4.) Wyeth states that it exceeded the annual minimum number of 1,100,000 Details by performing 1,920,654 Details in 2003. (Czenszak Dec. ¶ 18.) It also claims that after adjusting its fourth quarter of 2003 Detail report for a minor reporting error, it performed 439,460 Details which exceeded the minimum number required by 164,460. (Czenszak Dec. ¶ 20.)

On February 26, 2004, Wyeth demanded payment from King in the amount of $8,851,700 for 55,000 Excess Details pursuant to Section 9.4 of the Copromotion Agreement. (Pl. 56.1 Stat. ¶ 6; Pl. 56.1 Stat. Ex. 8.) This section requires the AMC to approve a claim for Excess Details that is greater than 105% of the annual minimum required number of Details. (*See* Agreement § 9.4.) Consequently, since the 2003 annual minimum required number of Details was 1,100,000, Wyeth claimed compensation for only 55,000 Excess Details. (Czenszak Dec. ¶ 23.) King refused to pay this amount. (Pl. 56.1 Stat. ¶ 7.)

King disputes Wyeth's version of events:

*First*, it claims that Wyeth was required to, and in fact did not, determine that King would fail to meet its minimum number of required Details before performing Excess Details. (Def. 56.1 Stat. ¶ 4.) It points out that Wyeth was above the quarterly targets throughout 2003; that its number of Altace® Details declined over the year; and that it conducted fewer Details in the fourth quarter than in any other quarter of 2003. Id. King claims that

these facts demonstrate that the "Excess Details," for which Wyeth claims compensation, were not a result of a "reasonable determination," but a natural consequence of the "ordinary course of Wyeth's previously planned sales activities." *Id.*

*Second*, King claims that many of Wyeth's claimed Details do not qualify as Details under the Corpromotion Agreement because the sales representatives either did not discuss Altace® primarily during their visits with doctors, or they included group presentations conducted at hospitals as Details. (Def. 56.1 Stat. ¶ 5.)

*Third*, King claims that it does not owe Wyeth for Excess Details because Wyeth's interpretation of Section 9.4 is erroneous in light of discussions around its drafting as well as the text of Section 11.4. (Def. 56.1 Stat. ¶¶ 6-7.) Fourth, King disputes Wyeth's claims that it waived its right to challenge Wyeth's fulfillment of its Detailing obligations under the Copromotion Agreement. (Def. 56.1 Stat. ¶ 8.)

## DISCUSSION

## I. Wyeth's Summary Judgment Motion

### A. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure state that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In the process of ruling on a motion for summary judgment, the Court "is to

resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Childers v. United States Postal Service*, 2003 U.S. Dist. LEXIS 9993, at *5 (W.D.N.Y. Apr. 15, 2003). The Court's "function is not to weigh the evidence or resolve issues of fact; it is confined to deciding whether a rational juror could find in favor of the non-moving party." *Lucent v. Int'l Business Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

"The burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs.*, L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). Specifically, "a 'genuine' issue is one that could be decided in favor of the non-moving party based on the evidence by a reasonable jury." *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004). Yet, "conclusory allegations (by the non-moving party) will not suffice to create a genuine issue." Id.

### B.   *Ambiguity of the Contract*

Wyeth argues that the Copromotion Agreement is unambiguous with respect to when it may exercise its rights under Section 9.4. King claims that Section 11.4 "reflects the parties' agreement that a party which fails to conduct the Minimum Targeted Details for any year incurs *no liability* under Section 9.4, unless that party misses its targets by more than 10%." (Def. Mem. at 16) (emphasis in original). It also claims that since Section 9.4 refers to the annual minimum targeted Details, Wyeth could not perform Excess Details based on a "reasonable determination" as to whether King would not meet the targeted number of Details at any point during the year. (Def. Mem. at 16-17.)

In *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295 (2d Cir. 1996), the Second Circuit set out the applicable standard:

> Under New York law . . . whether a contract is ambiguous is a matter of law for the court to decide, and parol evidence is not admissible to create an ambiguity. A contract is ambiguous where reasonable minds could differ on what a term means, but no ambiguity exists where the alternative construction would be unreasonable.

81 F.3d at 299 (citations omitted). Further, "[i]f contractual terms have a definite and precise meaning and are not reasonably susceptible to differing interpretations, they are not ambiguous." *Scholastic, Inc. v. Harris*, 259 F.3d 73, 82 (2d Cir. 2001) (citing *Seiden Assocs. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)). Nevertheless, "[a] contractual provision should be read so as to avoid rendering any part of the contract superfluous or without effect." *Omni Berkshire Corp. v. Wells Fargo Bank, N.A.*, 307 F. Supp. 2d 534, 540 (S.D.N.Y. 2004) (citing *Eastman Kodak Co. v. STWB Inc.*, 232 F. Supp. 2d 74, 92 (S.D.N.Y. 2002)).

Applying this standard, the Court rejects King's arguments for three reasons.

*First*, the contract is not ambiguous on its face. Section 9.4 permits one party to make up for the other's failure to meet the targeted number of Details as set out by the AMC in the annual marketing plan, as evidenced by quarterly progress, and to request compensation for these Details. Section 11.4, on the other hand, defines when the parties breach the Copromotion Agreement and permits one party to terminate the agreement for the other's failure to conduct ninety percent of the annual minimum number of Details. It also

provides that a party loses its right to hold the other in breach of contract if it exercises its rights under Section 9.4 by performing Excess Details. Accordingly, a party's rights and remedies under Section 9.4 only arise when a party makes a "reasonable determination" that the other party is not meeting its continuing obligations under the Copromotion Agreement, whereas a party's rights and remedies under Section 11.4 arise after a party has failed to meet its annual obligations. A fair reading of these sections reveal that they operate separately, except to the extent that Section 11.4 references Section 9.4, and that they simply allow for remedies at different points in the performance of the Copromotion Agreement. The ambiguity King claims exists in the interaction between these sections simply does not exist.

King also claims that the last sentence of Section 11.4 delineates the exclusive method for breaching the contract based on meeting minimum targeted number of Details. This sentence states: "Notwithstanding the foregoing, the parties agree that the Nonperforming party shall not be in breach of its Detailing obligations for any calendar year hereunder if the Nonperforming party provides at least ninety percent (90%) of the minimum number of Details it is required to perform during such calendar year." (Agreement § 11.4.) Under King's reading, the contract provides no remedy for a party's failure to meet the quarterly Detailing obligations set out in the annual marketing plan. This may render that bench-marking process futile. More importantly, New York law "disfavor[s] contract interpretations that render provisions of a contract superfluous," *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002), and King's reading of the

agreement would do just that, with respect to Section 9.4.  Consequently, since

the Agreement intended to require the parties to meet quarterly as well as

annual targets and created different remedies for their failure to do so, King's

argument fails.

*Second*, since "[i]t is well settled that 'extrinsic and parole

evidence is not admissible to create an ambiguity in a written agreement which

is complete and clear and unambiguous upon its face,'" *W.W.W. Assocs., Inc. v.*

*Giancontieri*, 566 N.E.2d 639, 642, 77 N.Y.2d 157, 163 (N.Y. 1990) (quoting

*Intercontinental Planning v. Daystrom, Inc.*, 248 N.E.2d 576, 580, 24 N.Y.2d 372,

379 (N.Y. 1969)), King's submission of parole evidence cannot make the

Copromotion Agreement ambiguous.  Moreover, "[a]n analysis that begins with

consideration of extrinsic evidence only when required to do so because of

some identified ambiguity, unnecessarily denigrates the contract and unsettles

the law." *Id.* at 643; 77 N.Y.2d at 163.  The Court will, therefore, disregard the

parole evidence submitted by King.

*Third*, King's offered interpretation is unreasonable.  Section 9.4

provides that "at any point in a year," a party may make a reasonable

determination based on whether the other party "is failing" to meet the

minimum number of required Details.  By the use of the present tense for the

condition precedent, it is beyond peradventure that a party may elect to perform

Excess Details upon its analysis of the other party's current progress, that the

decision may be made at any time throughout any year of the contract, and it is

irrelevant whether the other party, in fact, meets the annual minimum targeted

Details.  If the parties wanted the determination to be based on an assessment of

the future performance, they would not have conditioned the election of the remedies under Section 9.4 on an assessment of a party's current progress.

That Section 9.4 permits parties to elect to perform Excess Details based on a contemporaneous analysis of the other party's progress is also reasonable in light of the fact that the annual marketing plan sets quarterly as well as annual goals. This approach to monitoring the progress of the other party is also logical because it allows parties to remedy performance deficiencies on an ongoing basis, thereby protecting their ability to profit from the promotion of Altace® over the life of their eight-year agreement. If the plan set only annual goals and the contract did not require periodic progress reports, i.e. the Detail reports, then Section 9.4 would be meaningless.

### C.  Compliance with Section 9.4 of the Copromotion Agreement

Having determined that the contract is unambiguous, the Court must decide whether Wyeth met its requirements. Section 9.4 permits one party to elect to conduct Excess Details on the condition that that party "reasonably determines, based on the AHPC Detail Reports or the King Detail reports, as the case may be, that the other party *is failing* to conduct the minimum number or percentage of Details . . . required to be conducted by such other party by the Marketing Plan for such year." (Emphasis supplied.) Accordingly, the plain language of Section 9.4 permits one party to exercise its rights based on the facts before it.

Wyeth claims that its determination was reasonable because King missed the minimum number of Details in the second quarter of 2003 by more than 40,000 and in the third quarter by more than 47,000. It also claims that

11

since King's minimum number of Details increased dramatically in 2003 over the targets in 2001 (500,000) and in 2002 (650,000), it was concerned about whether it would be capable of meeting this target since it was behind for two consecutive quarters. "Reasonableness determinations are . . . quintessential jury issues . . . [S]ummary judgment on the reasonableness of someone's interpretation is appropriate only when no reasonable person could have assigned a particular meaning to the words used." *Pelligrino v. County of Orange*, 313 F. Supp. 2d 303, 321-23 (S.D.N.Y. 2004) (citing *Yesner v. Spinner*, 765 F. Supp. 48, 51 (E.D.N.Y. 1991)). Here, King assured Wyeth that it would meet its Detailing obligations for the year and took action to bolster its sales force. Further, there was a prior course of conduct between the two which resulted in successful annual completion of Details by King. Whether Wyeth reasonably determined to perform excess Details in 2003 is a fact question to be determined upon consideration of the totality of the circumstances. Based upon the submissions herein, the Court cannot say that the determination was reasonable as a matter of law.

King claims that this determination was unreasonable because: (1) Wyeth has failed to present any evidence demonstrating that the determination occurred; (2) the determination preceded the performance of "Excess Details"; and (3) Wyeth failed to explain why, if it intended to make up for King's failures, the total number of Details declined as 2003 came to a close. These challenges directly address the next step in the analysis; that is, whether or not Wyeth actually conducted extra Details in response to King's shortfall.

As discussed, *supra*, through its use of "may elect," Section 9.4 grants a party permission to conduct extra Details if the other party fails to meet its ongoing Detailing obligations. The party must therefore conduct extra Details as a result of its reasonable determination. It is Wyeth's burden to demonstrate that there is no genuine issue of material fact as to whether it, in fact, made this determination. With respect to lack of documentary evidence of the determination and its timing, Wyeth claims that the testimony of its executives is sufficient to demonstrate that there is no genuine issue of material fact that they determined that King was failing to meet its Detailing obligations. (Reply Mem. at 6.) And even if this testimony was insufficient, the Court is empowered to determine the reasonableness of its determination. *Id.*, at n.3. In response, King points out that a perfect example of this proof would be a document demonstrating that it elected to exercise its rights under Section 9.4. In any event, there is nothing in the record to establish that this determination actually occurred.

Wyeth must prove that there is no genuine issue of material fact as to whether it made the determination, and if it did, that it performed extra Details as a result of its determination. Section 9.4 permits a party to be compensated for *making up for* the other party's shortfall; it is not a remedy for extra performance. The testimony of Wyeth's executives does not establish this because none of them state that as a consequence of Wyeth's determination about King's failure to meet its Detailing obligations, it elected to perform Excess Details. Consequently, summary judgment is DENIED.

Finally, King questions whether the extra Details Wyeth claims it performed were the result of its reasonable determination because Wyeth conducted fewer Details as 2003 came to a close. In its reply brief, Wyeth argues correctly that the declining number of Details does not preclude its ability to make a claim under Section 9.4 for Excess Details. It then claims that King's claim fails because it elected to perform Excess Details. (Reply Mem. at 6.) This claim by Wyeth is not supported by any evidence. It is, therefore, insufficient to defeat King's argument. The lack of evidence connecting these alleged facts is extremely problematic, as Excess Details, as opposed to extra Details, gives rise to liability.

**D.    *Waiver***

King also challenges whether the Details Wyeth performed actually qualified as Details under the Copromtion Agreement. Wyeth argues that King has waived the right to make this argument because it did not so argue until after this lawsuit began. King responds that Wyeth cannot demonstrate that it waived its right to raise this defense as a matter of law because whether or not it did is an issue of fact. It also argues that Section 16.3 of the Copromotion Agreement is a non-waiver provision that precludes Wyeth's argument. This section states:

> The failure of either party to enforce or to exercise, at any time, any right arising pursuant to this Agreement does not constitute, and shall not be construed as, a waiver of such a term or right, and shall in no way affect that party's right to later enforce or exercise such term or right.

(Agreement § 16.3.)

It is well settled under New York law that "[a] waiver is an intentional abandonment or relinquishment of a known right or advantage which, but for such waiver, the party would have enjoyed." *Alsens Am. Portland Cement Works v. Degnon Contracting Co.*, 118 N.E. 210, 210, 222 N.Y. 34, 37 (N.Y. 1917); *see also Voest-Alpine International Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680, 685 (2d Cir. 1983). "Waiver cannot be created by negligence, oversight, or thoughtlessness; instead, it must be proved that a party intentionally or voluntarily waived a contractual right or advantage." *Edwards v. IBM Corp.*, 1994 U.S. Dist. LEXIS 13947, at *24 (S.D.N.Y. Sept. 23, 1994) (citing *Beacon Terminal Corp. v. Chemprene, Inc.*, 75 A.D.2d 350, 355-56, 429 N.Y.S.2d 715, 719 (N.Y. App. Div. 1980) (2d Dep't)). Thus, when the waiver is implied it is "rarely established as a matter of law rather than as a matter of fact." *Alsens Am. Portland Cement Works*, 222 N.Y. at 37. In fact, "a waiver may only be established as a matter of law by the express declaration of a party or in situations where the party's undisputed acts or language are so inconsistent with his purpose to stand upon his rights as to leave no opportunity for reasonable inference to the contrary." *Nettech Solutions, L.L.C. v. Zippark.com*, 2001 U.S. Dist. LEXIS 14753, at *18 (S.D.N.Y. Sept. 20, 2001) (citations and internal quotation marks omitted).

New York law also provides that "the existence of a non-waiver clause in a contract does not by itself preclude the waiver of a provision of, or right under, the contract." *In re Caldor*, 217 B.R. 121, 133 (S.D.N.Y. Bankr. 1998) (citing *TSS-Seedman's, Inc. v. Elota Realty Co.*, 72 N.Y. 2d 1024, 1029 (N.Y. 1988), and *Dice v. Inwood Hills Condominium*, 237 A.D. 2d 403, 404, 655

N.Y.S.2d 562 (N.Y. App. Div. 1997) (2d Dep't)). "Whether there was a

knowing and intentional waiver of rights is a factual question that we determine

based on the totality of the circumstances." *Id.* (citing *People v. Matthews*, 148

A.D.2d 272, 544 N.Y.S.2d 398 (N.Y. App. Div. 1989), *appeal dismissed*, 549

N.E.2d 487, 74 N.Y.2d 950 (N.Y. 1989)).

      The recent case of *Town of Hempstead v. Incorporated Village of*

*Freeport*, 15 A.D.3d 567, 790 N.Y.S.2d 518 (N.Y. App. Div. 2005) (2d Dep't),

is instructive. There, the parties entered into a multi-party agreement under

which certain villages agreed to take solid waste from the defendant for a

period of 25 years. *Id.* at 568. The agreement required the defendant to pay the

plaintiffs a minimum annual fee based on a minimum amount of tonnage of

acceptable waste delivered on a monthly basis (the "Minimum Commitment").

*Id.* at 568. The defendants were also required to pay the plaintiffs regardless of

whether they met the Minimum Commitment. *Id.* at 568. For the first ten years

of the term of the agreement, the plaintiffs failed to enforce the Minimum

Commitment requirement. *Town of Hempstead*, 15 A.D.3d at 568-89. Yet, in

1996, after they notified the defendant by letter of their intention to enforce this

requirement, the defendant failed to pay for its failure to meet this requirement.

*Id.* at 569. The plaintiffs then commenced suit for breach of contract. *Id.* In its

defense, the defendant claimed that the plaintiffs had waived their right to

enforce the Minimum Commitment requirement. *Id.*

      The Appellate Division of the New York Supreme Court affirmed

the trial court's dismissal of this defense citing three reasons. *Town of*

*Hempstead*, 15 A.D.3d at 520. *First*, it found that the contract authorized

plaintiffs in their sole discretion to reduce the Minimum Commitment amount without forfeiting their rights to increase it in the future. *Id. Second*, the agreement included a non-waiver clause. *Id. Finally*, the court found that plaintiffs had provided the defendant with notice of its intent to enforce the Minimum Commitment requirement. *Id.*

Here, the Copromotion Agreement does not limit one party's ability to demand payment under Section 9.4. Rather, it limits the right to terminate the contract pursuant to Section 11.4 should that party exercise its rights under the terms of Section 9.4. It in no way affects one party's ability to challenge the performance of the other. Further, the Copromotion Agreement includes a non-waiver clause. Wyeth must demonstrate that there is no genuine issue of material fact as to whether King waived its right to challenge Wyeth's 2003 Detail Reports. Wyeth supports its claim by listing three of King's omissions to act: (1) King failed to challenge Wyeth's Detail Reports until after this litigation began; (2) King failed to exercise its rights to audit Wyeth's Details; and (3) King failed to assert this defense in its letters of response to Wyeth's demand for payment for Excess Details. There is, however, nothing in the record from which this Court can infer King's intent. Consequently, it cannot be said that these omissions alone, especially in light of the Copromotion Agreement's non-waiver clause, establish that King intended to waive its right to challenge Wyeth's Detail Reports.

King makes three challenges to Wyeth's Detail reports for the fourth quarter of 2003:

*First*, James J. Holot, a King executive, testified that, at the parties' October 2004 AMC meeting, he (and King) learned that Wyeth may have included group presentations at hospitals in the number of Details reported. (*See* Holot Dec. ¶¶ 2-6.) Wyeth responds that this allegation is simply not true. It supports this argument with the declaration of Andrew Callos, Associate Vice President of Planning & Analysis in Wyeth's U.S. Marketing & Sales Operations group. Mr. Callos, however, simply points the Court to Wyeth's quarterly Detail reports which list the number of sales representatives involved. These lists, however, never state that each sales representative met with one physician at a time. Since Holot's claims are more than conclusory allegations, a jury – and not the Court – should decide which executive to believe. In other words, there is a genuine issue of material fact as to whether group presentations conducted at hospitals were included in the number of Details in Wyeth's fourth quarter of 2003 Detail report.

*Second*, King claims that since Wyeth's sales representatives were instructed that Altace® was to have 25% priority, the sales representatives may have included sales calls in which Altace® was not the primary topic of discussion. These visits therefore should not have been counted as Details. King supports this allegation with third-party data which it claims demonstrates that "physicians often reported Wyeth representatives presenting Altace® in a second or third (non-primary) position." (McCall Dec. ¶ 13.) But the data demonstrate that physicians often reported that if they did not recall that Altace® was presented first, they were most likely not to know the order in which it was presented, and not that it was presented in the second or third

place. (McCall Dec., Ex. 2.) The third-party data, therefore, does not create a genuine issue of material fact with respect to whether Wyeth's sales representatives submitted sales calls as Details that do not qualify under the Copromotion Agreement.

*Third*, King claims that since the number of Wyeth's Details decreased as 2003 ended as shown by third-party data, there is no way that they conducted Excess Details. Wyeth responds that this fact does not prove that it did not conduct additional Details to make up for King's shortfall. But the court must draw all favorable inferences in King's favor on this motion. Thus, Wyeth's blanket denial on this motion is insufficient.

This Court, therefore, DENIES Wyeth's motion for summary judgment because there are genuine issues of material fact in dispute. These issues include: (1) whether Wyeth reasonably determined to perform extra Details; (2) whether Wyeth actually conducted extra Details as a result of its reasonable determination that King was failing to meet its Detailing obligations; and (3) whether all of the Details it performed actually qualified as Details under the Copromotion Agreement.[3]

## II.    King's Motions

In its cross-motion, King moves to strike Wyeth's claim for damages, and to dismiss the complaint or, in the alternative, for summary judgment. King claims that Section 9.4 creates an unenforceable penalty as

---

[3]In its opposition to Wyeth's motion, King does not respond to Wyeth's arguments regarding its affirmative defenses: that the complaint fails to state a claim; that there is want of consideration; and that Section 9.4 is an unenforceable penalty. Rather, King addresses some of these issues in its motion to strike and to dismiss the complaint.

opposed to a liquidated damages provision because twice the cost of Detail is out of proportion with ascertainable damages. Wyeth responds that it does not seek compensation for a breach, but for a "fixed charge, stipulated to by the plaintiffs for specified services to be rendered." (Wyeth Opp. at 14) (quoting *Jacobs v. Citibank, N.A.*, 92 A.D.2d 786, 787, 459 N.Y.S.2d 781, 782 (N.Y. App. Div. 1983) (1st Dep't), *aff'd*, 462 N.E.2d 1182, 1183-84, 61 N.Y.2d 869, 872 (N.Y. 1984)). It also argues that Section 9.4 is not a liquidated damages clause, but rather permits alternative performance. It claims further that even if Section 9.4 creates a liquidated damages clause, the amount is reasonable.

### A.     Motion to Strike

#### 1.     Standard on Rule 12(f) Motion

Rule 12(f) of the Federal Rules of Civil Procedure provides:

> Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

Fed. R. Civ. P. 12(f).[4] To succeed on this motion, King must convince the Court "that there are no questions of fact [and] that any questions of law are clear and not in dispute, and that under no set of circumstances could the [claim] succeed." *Ali v. New York City Transit Authority*, 176 F.R.D. 68, 70

---

[4]The parties did not address the untimeliness of this motion. Rule 12(f), however, grants the Court discretion "to strike any redundant, immaterial, impertinent or scandalous references in a complaint," it has "the authority, at any time, to consider a motion to strike after the twenty (20) day period." *Wine Markets Int'l, Inc. v. Bass*, 177 F.R.D. 128, 133 (E.D.N.Y. 1998) (Spatt, *J.*) (citations omitted); *accord Rosenblatt v. United Air Lines, Inc.*, 21 F.R.D. 110 (S.D.N.Y. 1957). As a result, the Court considers this motion on its merits.

(E.D.N.Y. 1997) (Johnson, *J.*) (citing *Carter-Wallace, Inc. v. Riverton Laboratories, Inc.*, 47 F.R.D. 366, 368 (S.D.N.Y. 1999)).

Since there are hotly contested questions of law and fact with respect to the operation of Section 9.4, King has failed to meet this burden.  *See Resources Funding Corp. v. Congrecare, Inc.*, 1994 U.S. Dist. LEXIS 508, at *15 (S.D.N.Y. Jan. 19, 1994) (denying a motion to strike where there were questions as to whether a contract clause was a liquidated damages clause or unenforceable penalty).  Moreover, the cases it cites to support the proposition that Rule 12(f) grants the Court permission to strike an unlawful claim for damages are readily distinguishable.  In *Mills v. Fox*, 421 F. Supp. 519, 524 (E.D.N.Y. 1976), an employment discrimination case brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000 *et seq.*, the court granted the defendant's motion to strike a damages claim because the punitive damages sought were generally not authorized by the statute at issue.  *See Mills*, 421 F.Supp. at 524 (collecting cases).  Similarly, the court in *Quinn v. Strauss Broadcasting Group, Inc.*, 309 F. Supp. 1208, 1209 (S.D.N.Y. 1970), granted the defendant's motion to strike the damages clause of the complaint because the damages sought by the plaintiff were greater than those explicitly allowed under New York law.  Here, the issue is not whether the damages claimed are authorized by law – clearly, liquidated damages are – but whether the damages claimed qualify as liquidated damages.

Moreover, Rule 12(f) requires a more thorough analysis than King has advanced on this motion.  It was required to show three things:  (1) that no question of fact which might allow Plaintiff's claim to proceed exists; (2) that

no substantial question of law, a resolution of which would help the Plaintiff's claim succeed, exists; and (3) that it is prejudiced by the inclusion of this claim. *See County Vanlines, Inc. v. Experian Information Solutions, Inc.*, 205 F.R.D. 148, 153 (S.D.N.Y. 2002) (citing *Securities and Exchange Comm'n v. Toomey*, 866 F. Supp. 719, 722 (S.D.N.Y. 1992)). As to the second, and dispositive requirement here, "a motion to strike 'is not intended to furnish an opportunity for the determination of disputed and substantial questions of law.'" *Id.* (quoting *United Artists Assoc., Inc. v. NWL Corp.*, 198 F. Supp. 953, 959 (S.D.N.Y. 1961)). This is precisely what King requests of this Court. King's motion is, therefore, DENIED.

### 2. *Motion to Dismiss*

King advances its motion to dismiss on the following: (1) the damages clause is unenforceable as a matter of law; and (2) without a legally-supportable claim for damages, Wyeth's breach of contract claim fails under Fed. R. Evid. 12(c). King's motion to dismiss is DENIED, as it has failed to prove that the damages provision under Section 9.4 of the Copromotion Agreement is unenforceable as a matter of law on the pleadings.

**CONCLUSION**

Wyeth's motion for summary judgment is DENIED because genuine issues of material fact remain in dispute.  King's motion to strike is DENIED, as it raises issues that are inappropriate for resolution on that motion. King's motion to dismiss, or, in the alternative, for summary judgment, is DENIED because it cannot be said that under no set of facts could Wyeth prove that its damages clause is valid.

SO ORDERED.

Dated:  Brooklyn, New York
        October 17, 2005

                        _____S/_____
                        SANDRA L. TOWNES
                        United States District Judge